UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 24-cv-_____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| WILLIAM D. CARLTON, | **JURY DEMAND** |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), for its Complaint against Defendant William D. Carlton alleges as follows:

**SUMMARY**

1. Carlton, a former investment adviser, engaged in a long-running and fraudulent trade allocation scheme—commonly referred to as "cherry picking"—in which he benefitted himself to the detriment of his investment advisory clients.

2. Carlton's scheme involved placing stock trades in his personal trading accounts and observing the daily price movements of the stocks. If the price of the stock increased during the day, Carlton often sold the shares, locking in short-term profits for himself. If the price of the stock decreased during the day, Carlton often moved some or all of the shares to his clients' accounts, thereby avoiding short-term losses. In short, by waiting and watching the price movements of the stocks he purchased in his personal accounts before deciding whether to keep

Complaint
SEC v. Carlton
Case No.

1

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

the trades for himself or allocate the trades to his clients, he was able to "cherry pick" trades that were immediately profitable for himself, to the detriment of his clients to whom he owed a fiduciary duty.

3. Between at least January 2015 and August 2022, Carlton generated millions of dollars in ill-gotten gains through his clandestine cherry-picking scheme.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), (d)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)], and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), (e)].

5. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

6. Carlton, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the acts, practices, transactions, and courses of business alleged herein.

7. Venue lies in this district because at all relevant times Carlton lived in and transacted business in the Western District of Washington, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including placing orders for securities and directing a securities broker to allocate trades in furtherance of his fraudulent scheme.

## DEFENDANT

8. **Carlton**, age 64, was an investment adviser representative associated with then SEC-registered First Allied Advisory Services, Inc. ("First Allied") from July 2012 to November 2020 and SEC-registered Cetera Investment Advisers LLC ("Cetera") from November 2020 until his termination in December 2023. Between 2008 and 2022, Carlton was also a registered

Complaint
SEC v. Carlton
Case No.

2

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

representative associated with a broker-dealer that was, during that period, registered with the SEC ("Broker A").

9. As an investment adviser representative, Carlton was compensated for providing clients with investment advice, including making trading decisions on when to buy and sell stock on behalf of his clients.

## FACTS

**I.  Carlton Owed a Fiduciary Duty to his Clients.**

10. Between at least January 2015 and December 2023, Carlton worked as an investment adviser representative, initially for First Allied and then Cetera, and as an investment adviser serving roughly 50-70 clients in any given year.

11. At all relevant times, Carlton had authority to trade securities on behalf of his clients. He was responsible for choosing investment strategies for his clients and executing those strategies through purchasing and selling securities on their behalf.

12. Investment advisers and investment adviser representatives such as Carlton owe their clients a fiduciary duty, which includes the obligation to act in their clients' best interests, to exercise the utmost good faith in dealing with their clients, to disclose to clients all material facts, and to employ reasonable care to avoid misleading their clients.

13. Both First Allied and Cetera had policies that prohibited investment adviser representatives from disadvantaging their clients when trading securities for their own accounts. First Allied and Cetera informed advisory clients of these policies in their firm brochures, which stated that investment adviser representatives were "not permitted to disadvantage clients while trading in their own accounts." Yet this is precisely what Carlton did.

**II.  Carlton Engaged in a Scheme to "Cherry Pick" Profitable Trades for Himself and Allocate Unprofitable Trades to His Clients.**

14. Contrary to First Allied's and Cetera's policies, and in breach of his fiduciary duty to his clients, from at least January 2015 through August 2022, Carlton engaged in a pattern and practice of placing trades for himself and his clients in his personal accounts, and then

Complaint
SEC v. Carlton
Case No.

3

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

disproportionately keeping "winning" trades for himself, while surreptitiously saddling his clients with "losing" trades that he allocated to their accounts.

15. Carlton perpetrated his scheme by purchasing securities in one of his personal trading accounts, which included a joint account held in the name of Carlton and his wife, and an account in the name of Carlton Wealth Management. These accounts, along with others held for the benefit of Carlton or his wife, are referred to herein as the "Carlton Accounts."

16. After purchasing a security in one of the Carlton Accounts, Carlton would watch its price fluctuate throughout the trading day. If the price of the security increased, Carlton often sold the security the same day, locking in risk-free, first-day profits for himself. If the price of the security fell, Carlton frequently called the trading desk of Broker A later in the trading day and instructed them to allocate some or all of the unprofitable trades to one or more of his clients' accounts, keeping only a fraction of the unprofitable trades for himself, thereby avoiding first-day losses.

17. This process allowed Carlton to disproportionately reward himself with trades with positive first-day returns (i.e., trades that increased in price from the time of purchase to the time of sale or market close) and unload on unsuspecting clients trades with negative first-day returns (i.e., trades that decreased in price from the time of purchase to the time of sale or market close).

18. Starting in January 2015 and continuing through August 2022, the trades that Carlton allocated to the Carlton Accounts increased in value nearly 70 percent of the time on the trade day. In contrast, the trades that Carlton allocated to all other accounts that he controlled (the "Client Accounts") increased in value only about 14 percent of the time on the trade day.

19. Because of Carlton's cherry-picking scheme, his allocations netted him first-day returns of approximately .50 percent in the Carlton Accounts, whereas his Client Accounts absorbed first-day *losses* of nearly 2.1 percent. A statistical test of the difference in first-day returns between the Carlton Accounts and his Client Accounts finds that the likelihood of this disparity happening by chance is nearly zero.

Complaint
SEC v. Carlton
Case No.

4

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

### A. Examples of Carlton's Cherry Picking

20. Carlton purchased shares of Blink Charging Co. in one of his personal accounts on consecutive trading days in January 2021. On January 14, Carlton purchased 2,000 Blink Charging shares at 11:12 a.m. for $52.91 per share. Soon after he purchased the shares, the price rose to more than $54 per share. So Carlton sold the 2,000 shares, netting himself a first-day profit of approximately $2,175.

21. The next morning, January 15, 2021, at 9:33 a.m., Carlton again purchased 2,000 Blink Charging shares in the same personal account, this time for $52.26 per share. But the share price fell throughout the day. Carlton continued to purchase Blink Charging shares as the price fell, buying a total of 6,000 shares for $299,011 in his personal account. Facing an unrealized first-day loss of approximately $16,411 (based on Blink Charging's closing price of $47.10 per share), Carlton decided not to keep these shares for himself but instead instructed Broker A to move the shares out of his personal account and allocate all of these first-day losing trades to eight of his Client Accounts.

22. Similarly, on the morning of November 18, 2021, Carlton purchased 200 shares of Affirm Holdings, Inc. in one of his personal accounts for $141.85 per share. He sold the shares later that morning for an average price of $145.44 per share, pocketing for himself a first-day profit of about $719.

23. Two trading days later, on November 22, 2021, Carlton again purchased Affirm Holdings shares starting at 9:32 a.m., when he bought 200 shares in one of his personal accounts for $135.21 per share. This time, the share price fell throughout the day, and Carlton continued to periodically buy shares in one of his personal accounts until minutes before markets closed, when at 3:58 p.m., he made a final purchase of 500 shares for $123.09 per share. In total that day, Carlton purchased 2,500 shares in one of his personal accounts for an average price of $127.67 per share. Affirm Holdings shares closed that day at $123.51 per share. As a result, Carlton faced an unrealized first-day loss of approximately $10,400. Carlton chose to allocate $7,912 of that unrealized first-day loss to his clients, spreading it across seven Client Accounts.

Complaint
SEC v. Carlton
Case No.

5

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

        **B.**     **Carlton's Scheme Resulted in Millions in Unlawful First-Day Profits for Himself and Millions More in First-Day Losses For His Clients.**

24. Above are just two examples of a pattern and practice that Carlton repeated thousands of times from January 2015 through August 2022, where Carlton captured first-day gains for himself, while allocating some or all of his first-day losses to his clients.

25. In most instances, Carlton allocated the entirety of trades that generated first-day profits to himself. In rare instances, however, he allocated a portion of these winning trades to his clients.

26. When Carlton placed trades that declined in value on the first day, Carlton usually kept some of these positions for himself and allocated the remainder to his clients, as illustrated above with the purchases of Affirm Holdings stock.

27. But in the aggregate, Carlton's deceptive practices netted him approximately $5.3 million in illicit first-day profits (both realized and unrealized), while causing his clients to suffer first-day losses of more than $6.4 million (mostly unrealized).[1] As a result of this scheme, nearly every month from January 2015 through August 2022, the Carlton Accounts reaped aggregate first-day trading profits and showed a positive first-day rate of return; Carlton's Client Accounts, in contrast, suffered aggregate first-day losses and a negative first-day rate of return every single month for more than seven years.

        **C.**     **Carlton's Scheme Ended When Cetera Prevented Him From Allocating Trades To Clients From His Personal Accounts.**

28. In September 2022, Cetera prohibited Carlton from placing trades in his personal accounts that he later allocated to client accounts. Because he was no longer able to see share price movements before allocating his trades, his scheme was over. His fraudulent first-day profits vanished, as did his clients' first-day losses, as summarized in the charts below.

---

[1] Carlton's first-day profits were mostly realized, as he often sold shares the same day he bought them when doing so would lock in a risk-free profit. Carlton's clients' first-day losses were mostly unrealized, as Carlton simply directed the brokerage trading desk to move the losing trades from his personal account to his Client Accounts without selling the shares.

Complaint
SEC v. Carlton
Case No.

6

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

29.     Monthly profits and rates of return for the Carlton Accounts from January 2015 through December 2023 are summarized in the following chart:



30.     As shown above, during Carlton's cherry-picking scheme, the Carlton Accounts earned aggregate first-day profits and positive first-day rates of return in 89 of 92 months. But once Cetera stopped Carlton from allocating trades to his clients from his personal accounts, the Carlton Accounts earned first-day profits and positive first-day rates of return in only 6 of the next 16 months.

31.     Conversely, during Carlton's cherry-picking scheme, Carlton's Client Accounts suffered first-day losses and negative first-day rates of return *every single month for more than seven years*. But after Cetera stopped Carlton from allocating trades from his personal accounts, his Client Accounts earned first-day profits and positive first-day rates of return in eight of the next 16 months, as shown below:



Complaint
SEC v. Carlton
Case No.

7

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

32. Carlton was terminated as an investment adviser representative in December 2023.

### III. Carlton Acted with Scienter.

33. Carlton knew or was reckless in not knowing, and should have known, that he was engaging in numerous deceptive acts by disproportionately allocating profitable trades to the Carlton Accounts and non-profitable trades to his Client Accounts.

34. During the course of the Commission's investigation of this matter, Carlton, in a recorded interview, denied ever making trades in his personal accounts that he later allocated (directly or indirectly) to his Client Accounts. He instead claimed that he logged into each client's account individually to place trades on each client's behalf.

35. That was a lie. Carlton bought securities in his personal accounts and allocated them to his Client Accounts through the brokerage trading desk thousands of times from January 2015 through August 2022. Only occasionally did he log into the Client Accounts to place trades on their behalf.

36. Carlton knew that purchasing securities in his personal accounts, watching the prices throughout the day, and then deciding how to allocate the trades was wrong. Specifically, he acknowledged that trading securities for himself and his clients, averaging the prices of the transactions, and then asking the trade desk to move shares from his own accounts to his clients' accounts would be wrong, "both morally and otherwise," as he put it. Carlton was correct; his allocation scheme violated his fiduciary duties to his clients and violated the federal securities laws.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**

37. The Commission repeats and incorporates by reference the allegations in paragraphs 1-36 above as if set forth fully herein.

38. By engaging in the conduct described above, Carlton, directly or indirectly, acting knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of

Complaint
SEC v. Carlton
Case No.

8

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

the mails, in connection with the purchase or sale of securities, has (i) employed devices, schemes or artifices to defraud; and (ii) engaged in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

39. By reason of the foregoing, Carlton has violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)].

## SECOND CLAIM

### Violation of Sections 17(a)(1) and (3) of the Securities Act

40. The Commission repeats and incorporates by reference the allegations in paragraphs 1-36 above as if set forth fully herein.

41. By engaging in the conduct described above, Carlton, directly and indirectly, acting knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or the mails, has (i) employed devices, schemes or artifices to defraud; and (ii) engaged in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

42. By reason of the foregoing, Carlton has violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)].

## THIRD CLAIM

### Violation of Sections 206(1) and (2) of the Advisers Act

43. The Commission repeats and incorporates by reference the allegations in paragraphs 1-36 above as if set forth fully herein.

44. At all relevant times, Carlton was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

45. By engaging in the conduct described above, Carlton, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed a device, scheme, or artifice to defraud a client or prospective client and (ii) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

Complaint
SEC v. Carlton
Case No.

9

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526

46. By reason of the foregoing, Carlton has violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Carlton and each of his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect;

B. Require Carlton to disgorge his ill-gotten gains, plus pre-judgment interest;

C. Require Carlton to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

D. Award such other and further relief as the Court deems just and proper.

Dated: September 27, 2024

Boston, Massachusetts

/s/ *David J. D'Addio*
David D'Addio
Susan R. Cooke
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-4526 (D'Addio direct)
daddiod@sec.gov (D'Addio email)

Complaint
SEC v. Carlton
Case No.

10

Securities and Exchange Commission
33 Arch Street, Boston, MA 02110
617-573-4526